UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

PUBLIC ART FUND,

                *Plaintiff,*

    -against-

TITON BUILDERS, INC. and TRU-STEEL
CORPORATION,

                *Defendants.*

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-5-16

13 Civ. 7620 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

In 2011, Plaintiff Public Art Fund ("PAF") commissioned a kinetic work of art called "How I Roll," consisting of a small airplane which rotated nose over tail, while being held in place by a support structure, to be exhibited in Central Park. In April 2012, PAF contracted with Defendant Titon Builders Inc. to fabricate the sculpture's support structure; Titon then subcontracted the fabrication work to co-Defendant Tru-Steel Corporation. Tru-Steel completed the work and the exhibit opened on June 20, 2012. About a month later, on July 18, the support structure failed and the sculpture crashed.

PAF claims Tru-Steel produced deficient welds that caused the support structure's failure. PAF sues Titon for breach of contract, negligent retention, and negligent supervision; and sues Tru-Steel for negligence. PAF seeks recovery of costs incurred in emergency de-installation and storage; as well as future costs to restore the exhibit. Titon counterclaims for the amount it is owed under their contract, arguing essentially that PAF's engineer is at fault for

1

designing a support structure that was doomed to fail. Titon also cross-claims against Tru-Steel for indemnification, contribution, and breach of contract.

The parties now cross-move for summary judgment. There are many factual disputes about the cause of, and responsibility for, the structural failure. Summary judgment is not appropriate in these circumstances. Accordingly, the Court (i) DENIES the cross-motions on PAF's and Titon's opposing breach of contract claims; (ii) DENIES the cross-motions on PAF's negligence claim; (iii) DENIES the cross-motions on Titon's indemnification, contribution, and breach of contract claims; and (iv) GRANTS Titon's unopposed motion to dismiss PAF's negligent retention and supervision claims.

## BACKGROUND

In 2011, PAF commissioned Paola Pivi to create the "How I Roll" sculpture, which consisted of a Piper Seneca airplane modified to allow it to rotate 360 degrees, nose over tail, while suspended by its wing tips. Dkt. 90 ¶¶ 2-3. PAF hired engineering firm Ove Arup & Partners ("Arup") to design a support structure that would provide the necessary support to allow suspension and rotation of the plane by its wing tips. *Id.* ¶¶ 4-6. Brian Markham, an engineer at Arup, produced engineering drawings and sent them to metal fabricator Stella Metals LLC ("Stella") to produce shop drawings, which provide further detail and direction as to the fabrication of the support structure. *Id.* ¶¶ 7-8; Dkt. 80 ¶¶ 17-18.

The drawings contain specifications for the weld connecting the fuselage to the wings. Arup's engineering drawings contain a letter "M" in a rectangle indicating the specification for that weld. Dkt. 88, Ex. A at S2.01. Stella's shop drawings also contain the "M" symbol, along with the letters "CJP." Dkt. 88, Ex. B at A1.0, A1.3. The engineering drawings also have a "Testing and Inspections" provision, which states: "The owner will retain a NYC prequalified

independent testing agency to inspect, conduct tests, and provide records of the following types of work as required by the building code: . . . All structural steel welding." Dkt. 88, Ex. A at S0.01.

Markham sent the engineering and shop drawings to Gilbert Bowe, Titon's CEO. Dkt. 80 ¶ 18. Bowe in turn sent the drawings to Tru-Steel, which issued a proposal to Titon to perform the fabrication work (including the welds at issue) for $48,750. *Id.* ¶ 20. Titon then issued a proposal to PAF; and on April 20, 2012, PAF agreed in a written contract to pay Titon $48,849 to perform the fabrication work.[1] *Id.* ¶¶ 21-23; Dkt. 87, Ex. A.

Tru-Steel completed the fabrication work and delivered the sculpture to PAF on May 14, 2012, along with a certification, signed by Tru-Steel CEO Thomas Grinels, which reads:

> "Tru-Steel warrants that all welds both interior and exterior have been examined to meet and or exceed those as specified on contract documents, and that all the welding was performed by welders qualified to the [specifications of the American Welding Society ("AWS")]."

Dkt. 90 ¶ 14; Dkt. 76, Ex. O. PAF hired Art Crating, Inc. to assemble and install the sculpture. PAF did not retain an independent testing agency (or anyone else) to inspect Tru-Steel's work. During installation, two Art Crating employees took an unauthorized ride inside the plane. Dkt. 98, Ex. 12. The exhibit opened on June 20, 2012. Dkt. 90 ¶ 15. PAF intended to display the sculpture until August 26, but on July 18, the support structure failed and the sculpture crashed. *Id.* ¶¶ 15-16. PAF asserts that it incurred $51,301.14 in costs for the emergency de-installation and storage of the sculpture, above what it would have paid to remove the sculpture in the normal course at the end of the exhibition. Dkt. 87 ¶¶ 22-30. PAF also submits a detailed

---

[1] PAF apparently was not informed that Titon subcontracted the fabrication work to Tru-Steel, but all agree that Titon was permitted to enter into a sub-contract.

estimate prepared by Art Crating that calculates the cost to restore the sculpture as $377,400.65. Dkt. 86 Ex. C.

PAF hired John Brooks of John H. Brooks & Associates Inc. to investigate and report on the exhibit's failure.[2] Dkt. 90 ¶ 20. Brooks first determined that the sculpture failed at the weld connecting the airplane's right wing to the fuselage. Dkt. 86, Ex. A. Then Brooks reviewed the Arup engineering drawings and the Stella shop drawings and determined that they specified that the wings were to be connected to the fuselage with a complete joint penetration ("CJP") weld and a backing bar.[3] *Id.* Finally, Brooks performed ultrasonic tests and determined that Tru-Steel had connected the wings to the fuselage with partial joint penetration ("PJP") welds without backing bars. *Id.*

On August 10, 2012, Nicholas Baume, PAF's director, emailed Brooks' r

eport to Bowe at Titon. Baume wrote:

> I attach of copy of the inspection report conducted by Mr John Brooks related to the damaged welds of Paola Pivi's rotating plane sculpture commissioned by Public Art Fund. As the report makes unequivocally clear, the welds your company was contracted to fabricate were not done as specified in the engineering drawings supplied. As you know, one weld failed, necessitating the emergency removal of the sculpture.
>
> We are currently investigating the best way to remedy the situation. You should also be aware that as a result of the failure of the weld, we have had to incur significant out-of-pocked expenses, for which we intend to hold your company responsible.

*Id.* Two days later, Bowe replied:

> In receipt of your e-mail and inspection reports from Mr. Brooks we do not have a defense for the weld failure. I would like to [e]nsure you this was not an

---

[2] PAF includes the cost to retain Brooks in its emergency de-installation cost estimate.

[3] In a complete joint penetration weld, the weld metal extends through the entire joint thickness. The alternative is a partial joint penetration ("PJP") weld, in which the weld metal does not extend through the entire joint thickness. *See* American Welding Society, Standard Welding Terms and Definitions, 12th Ed., at 10, 31.

> intentional means of cutting corners. Mr. Brooks mentions AWS means for a full penetration weld to be performed with a backing plate. The welding procedure use[d] is also a[n] AWS approved full penetration procedure for pipe and tube steel. Obviously the procedure was not the problem, the weld was. Normal procedures the owner would have sent a licensed inspector to our welding shop to ensure the welds were adequate before it left the yard. Since we are located in Florida and the specifications (attached) required a N.Y. licensed inspector, this was not possible. This was a whirl wind project and I'm truly sorry this happened. I will be glad to call you when you are ready to discuss your cost. Let me know when would be a good time.

Dkt. 86, Ex. B. Bowe then sent Brooks' report to Grinels at Tru-Steel. Grinels prepared a two-page report, which he sent to Bowe on September 26, 2012 with the following cover email:

> Here you go straight from the latest AWS manual. You can modify it or send it [as] is but I intend to pursue this as far as needed. I did what was asked of me, poorly-in-hind sight. This does not excuse them from what was their responsibility. If anyone is to be held for putting the public in harm's way then I say it is them for putting the stupid thing up without inspecting it first.

Dkt. 85, Ex. D. In the attached report, Grinels argues that PAF should be liable for the failure because it was required to inspect the finished product. He writes in relevant part:

> There was no backing used, this did not cause the failure, a poor quality weld did, we agree to this. Had the inspection, "ultra sound," been done upon receipt of the unit from Florida we would have know[n] this right from the start. We would then have had the opportunity of repairing the weld to your specification.

*Id.* Defendants later hired Thomas Eagar, a Professor of Material Engineering at MIT, to investigate the cause of the weld failure. Dkt. 80 ¶¶ 40-41. Eagar reviewed the engineering drawings, the shop drawings, welding codes and guidebooks, Brooks' report, and deposition excerpts; but he did not inspect the actual sculpture.

On May 12, 2015, Eagar submitted a written report. Dkt. 81, Ex. 9. He first analyzed the engineering drawings and determined that "[t]he engineering drawing required a complete joint penctration weld with a back bar." *Id.* at 2. However, he noted that while the drawings require that welds conform to AWS standards, they contain "M" symbols, which have no meaning under the applicable AWS standard. *Id.* He then considered a letter from an AWS certified welding

5

inspector, which opines that the "M" could be interpreted to denote removal of the backing bar after welding by "machining." *Id.* But Eagar questioned that interpretation because "there is no way to machine away the backing bar on the inside of the tube after the weld is made," and wrote that "[t]he most probable explanation for the 'M' . . . symbol is that the engineer was mixing specifications" since the letter "M" *does* denote a backing bar under International Organization for Standards ("ISO") welding specifications. *Id.* at 2-3. Nonetheless, Eagar concluded that the engineering drawings were defective "in a manner that was confusing both before and after the weld was made." *Id.* at 3.

Next, Eagar compared the weld specified in the engineering drawings (CJP weld with backing bar) with the weld that he determined Tru-Steel actually produced (PJP weld without backing bar).[4] Eagar concluded that the two welds have the same fatigue life, which is the number of cycles before failure. *Id.* at 5. As such, "[t]here was no diminution in value due to the welding that was performed" and PAF "received exactly what their engineer designed for the PAF." *Id.* Eagar further opined that two workers riding in the plane during installation could have reduced fatigue life. *Id.* He blamed the support structure's failure on PAF and Arup for specifying welds with insufficient fatigue life. *Id.*

In October and November 2015, Grinels and Bowe disavowed their prior statements as to the "poor quality welds" and "not hav[ing] a defense for the weld failure." Dkt. 76, Ex. T; Dkt. 99. Both stated they were misled to believe that Brooks' report concluded that the erroneous welds caused the failure and that, having read Eagar's report, they now believe that Titon and

---

[4] To be precise, Eagar describes Tru-Steel's weld as a PJP/CJP weld because he found that the weld was partial in some regions and complete in other regions. For sake of clarity, however, the Court will refer will refer to the Tru-Steel weld as simply a "PJP" weld, while noting that this might not be the most precise description.

Tru-Steel substantially complied with the contract by providing a weld with equivalent fatigue strength as that specified in the engineering drawings. *Id.*

## DISCUSSION

### I. Applicable Law

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court "resolve[s] all ambiguities and draw[s] all reasonable inferences in the light most favorable to the nonmoving party." *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013). Summary judgment is warranted where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015).

### II. Analysis

#### A. PAF's and Titon's breach of contract claims

PAF and Titon cross-move for summary judgment on their opposing breach of contract claims. To prevail on a contract claim under New York law (which all agree applies), a party must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000).

PAF argues that it is entitled to summary judgment because the undisputed evidence demonstrates that Titon materially breached the contract by providing a structure with the wrong welds, causing subsequent damages. Dkt. 89 at 6-8. Titon contends that it is entitled to summary judgment because (i) the engineering drawings are ambiguous and Tru-Steel's interpretation was reasonable; (ii) any error should be excused because PAF failed to satisfy its obligation to inspect on delivery; (iii) Tru-Steel substantially performed by providing a weld of

7

equivalent fatigue strength and there is no evidence that the erroneous weld caused the damages; and (iv) PAF fails to provide sufficient evidence of damages. Dkt. 78, 83, 101.

### 1. *Ambiguity in the engineering drawings*

Titon asserts that it did not breach because (i) the engineering drawings are ambiguous, and (ii) Tru-Steel's interpretation of the drawings was reasonable. Dkt. 101 at 9. Under New York law, "[w]hether a writing is ambiguous is a question of law for a court, while the meaning of an ambiguous contract is a question of fact for a factfinder." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001). "An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Deb. Tr. Co. of NY v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010). "[E]vidence as to custom and usage is considered, as needed, to show what the parties' specialized language is fairly presumed to have meant." *Id.* at 466-67 (quotation marks and brackets omitted).

The Court holds that Titon has failed to establish that the engineering drawings are ambiguous. The dispute is not over the interpretation of contract language, but rather the meaning of the "M" symbol used in the drawings and whether it is a valid symbol under the applicable AWS code. And Eagar's report—the only expert evidence introduced to aid the Court in interpreting the drawings—does not resolve the issue. On the one hand, Eagar opines that there is "some logic" to interpreting the "M" symbol to denote "removal of the backing bar after welding by 'machining.'" Dkt. 76, Ex. W at 2. But, on the other hand, he also states that the "most probable" interpretation is the opposite—use of a permanent backing bar—since that is what is denoted by the "M" symbol under ISO specifications. *Id.* at 3. Yet Eagar cautions that

8

the latter interpretation is also uncertain because "[m]ixing of symbol specifications is improper" under AWS and "the two systems have differences that can cause interpretation difficulties for the unacquainted user." *Id.* at 3. The record is incomplete. The engineering drawings may be subject to multiple reasonable interpretations; but on the other hand, Eagar's determinations may be on adequate basis in the determination of ambiguity.

Nor has Titon adduced sufficient extrinsic evidence for the Court to conclude as a matter of law that Tru-Steel's interpretation of the drawings was reasonable; indeed, PAF cites ample evidence supporting the contrary conclusion—that Tru-Steel understood the drawings to specify a CJP weld with a permanent backing bar. *See* Dkt. 107 at 8. Accordingly, this is not the "rare case" in which the evidence is "so one-sided that no reasonable factfinder could find to the contrary" of Tru-Steel's interpretation. *Scholastic*, 259 F.3d at 83. Which interpretation is more reasonable is a question for the jury. Summary judgment on this ground is denied.

### 2.  *PAF's duty to inspect*

Next, Titon argues that it did not breach because the engineering drawing's "Testing and Inspection" provision required PAF to retain an independent testing agency to inspect Tru-Steel's welds, and PAF's failure to do excuses Titon from liability. Dkt. 101 at 21-22. Even if PAF had had a duty to inspect (and breached that duty), Titon's allegedly deficient performance would be excused only if Titon can show that PAF's breach was material. *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, 361 F. Supp. 2d 283, 295 (S.D.N.Y. 2005). "Under New York law, for a breach of a contract to be material, it must go to the root of the agreement between the parties." *Id.* "[I]n most cases, the question of materiality of breach is a mixed question of fact and law—usually more of the former and less of the latter—and thus is not properly disposed of by summary judgment." *Id.*

Titon has not shown that PAF's purported failure to inspect was a material breach. In particular, the fact that Tru-Steel certified on delivery that "all welds both interior and exterior have been examined to meet and or exceed those as specified on contract documents" presents strong evidence that any breach of the inspection provision was immaterial. Dkt. 76, Ex. O. Thus, summary judgment on this basis is denied.

### 3. *Material breach and substantial performance*

PAF contends that it is entitled to summary judgment because Defendants materially breached the contract by producing a deficient weld, as evidenced by the purported admissions of Bowe ("we do not have a defense for the weld failure") and Grinels ("[t]here was no backing plate used, this did not cause the failure, a poor quality weld did, we agree to this"). Dkt. 89 at 6-10. Titon, on the other hand, argues that it is entitled to summary judgment because it substantially complied with the contract by providing a weld of equivalent fatigue life as that specified, as supported by Eagar's report. Dkt. 83 at 11-12.

Material breach and substantial performance are two sides of the same coin. *Bernard v. Las Am. Comm., Inc.*, 84 F.3d 103, 109 (2d Cir. 1996) ("Substantial performance is the antithesis of material breach. If it [is] determined that a breach is material, it follows that substantial performance has not been rendered."). And since there are genuine disputes of material fact, summary judgment for either side is inappropriate. *See Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("The issue of whether a party had substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain.").

To counter this conclusion, Titon argues PAF's failure to submit an expert report to rebut Eagar's report is fatal, and that the statements by Bowe and Grinels are irrelevant because they

10

were misled by Brooks' report, are not engineers, do not possess sufficient knowledge to calculate fatigue life, and later recanted their admissions. Dkt. 116 at 8-12. Those are arguments for the jury, not for the Court on summary judgment. Viewing the evidence in the light most favorable to PAF, a reasonable jury could conclude that Eagar's report is unreliable or wrong, and that Bowe (Titon's CEO) and Grinels (Tru-Steel's CEO) knew or had reason to believe Tru-Steel produced poor welds that caused the support structure's collapse. That is enough evidence for a jury to find a material breach.[5]

PAF for its part claims that Bowe's and Grinels' admissions demonstrate Defendants' material breach as a matter of law. Dkt. 95 at 6. They further contend that Bowe's and Grinels' contrary affidavits are "shams" and Eagar's conclusions are irrelevant because he did not inspect the actual welds performed. Dkt. 121 at 2-3. Again, those are arguments for the jury. Viewing the evidence most favorably to Titon, a reasonable jury could conclude that Bowe and Grinels were misled by Brooks into making statements about which they had no actual knowledge, and that Tru-Steel substantially performed by providing welds of equivalent fatigue life.

The cross-motions for summary judgment on grounds of material breach, substantial performance, and causation are denied.

### 4. *PAF's damages*

Titon and Tru-Steel argue PAF fails to adequately evidence its damages by submitting only estimates that are not supported by expert analysis. Dkt. 78 at 10-11. They also contend that PAF failed to mitigate its losses by leaving the sculpture outside, where it was "subject to a potentially deteriorating condition." *Id.* at 12. The Court disagrees. PAF has submitted detailed

---

[5] Titon also contends that Eagar's report is unrebutted evidence that disproves causation. Dkt. 83 at 12. Not so. A jury could reasonably infer causation from Grinels' statement soon after the incident that "[t]here was no backing plate used, this did not cause the failure, a poor quality weld did, we agree to this."

11

invoices that account for costs incurred in inspecting the damaged sculpture, de-installation, and storage, as well as future repair and re-installation costs. Dkt. 87 ¶¶ 22-30; Dkt. 86 Ex. C. And PAF asserts that it is not seeking recompense for any damage to the plane that occurred during storage. Dkt. 92 at 10. PAF's evidence is sufficient to show that it has suffered damages that are not "merely speculative" and are "reasonably certain and directly traceable to the breach." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994). Whether PAF is entitled to the full extent of the damages it seeks is a question for the jury.

The cross-motions for summary judgment on the breach of contract claims are denied.[6]

### B. PAF's negligence claim

Second, PAF and Tru-Steel cross-move for summary judgment on the negligence claim. The issues raised here are the same as in the breach of contract claims: did Tru-Steel provide materially defective work, did it substantially performed, and did its work cause damages? As described above, those issues all present genuine disputes of material facts. The cross-motions for summary judgment on PAF's negligence claim are denied.

### C. Titon's indemnification, contribution, and breach of contract claims

Third, Titon and Tru-Steel cross-move for summary judgment on Titon's claims for indemnification, contribution, and breach of contract. These claims all require a finding that Tru-Steel was negligent, the resolution of which, as just explained, presents genuine factual disputes. "[W]here a question of fact exists regarding the [subcontractor's] negligence, a conditional order of summary judgment for contractual indemnification must be denied as

---

[6] PAF also argues that permitting Titon to collect on its counterclaim would be a "windfall" because Tru-Steel has represented that it does not intend to seek payment from Titon, even if Defendants prevail. Dkt. 121 at 4; Dkt. 122 at 20-21. The Court disagrees. If the jury finds that Titon fulfilled its contractual obligations, then Titon has a right to payment from PAF; its private commercial dealings with Tru-Steel are irrelevant.

premature." *Bellefleur v. Newark Beth Israel Med. Ctr.*, 66 A.D.3d 807, 808 (2d Cir. 2009). The cross-motions are denied as premature.

### D. PAF's negligent retention and negligent supervision claims

Finally, Titon moves to dismiss PAF's negligent retention and negligent supervision claims. "To hold a party liable under theories of negligent hiring, negligent retention, and negligent supervision, a plaintiff must establish that the party knew or should have known of the contractor's propensity for the conduct which caused the injury." *Bellere v. Gerics*, 304 A.D.2d 687, 688 (N.Y. App. Div. 2d Dept. 2003). There is no evidence in the record that Titon knew or should have known that Tru-Steel had a propensity to produce defective welds. PAF does not oppose Titon's motion; which is granted. The negligent retention and negligent supervision claims are dismissed.

### CONCLUSION

The Court (i) DENIES the cross-motions on PAF's and Titon's breach of contract claims; (ii) DENIES the cross-motions on PAF's negligence claim; (iii) DENIES the cross-motions on Titon's indemnification, contribution, and breach of contract claims as premature; and (iv) GRANTS Titon's motion to dismiss PAF's negligent retention and supervision claims.

The parties are directed to appear at a status conference on Wednesday, July 20 at 10:00 am in Courtroom 14C to set a date for trial. The Clerk is directed to terminate all open motions.

Dated: New York, New York
July [ 5 ], 2016

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge

13